FRANK X. WENTURA, Appellant, v. WILLIAM A. KINNERK ET AL.—5 S. W. (2d) 66.

FRANK X. WENTURA v. WILLIAM A. KINNERK ET AL.; HARRISON HART ET AL., Appellants.—5 S. W. (2d) 66.

Division One, April 11, 1928.

*T. D. Cannon* and *R. M. Nichols* for appellant.

*C. Orrick Bishop* for respondent.

*N. Murry Edwards,* also, for respondents.

RAGLAND, J.—This case comes to the writer for an opinion on reassignment. It is a statutory will contest. Two paper writings

are involved; both were executed by Arrena R. Pierron, one on August 11, 1923, and the other on the day following, August 12th. In the first plaintiff was made sole beneficiary, named as executor, and authorized to qualify as such without bond. In the second there were: provisions for the cremation of the testatrix's remains and for the erection of a three-thousand-dollar monument on her lot in Bellefontaine Cemetery, in St. Louis; a bequest of $2500 "to the Cowden Cemetery of Cowden, Illinois, on condition that said cemetery . . . perpetually care for and maintain a lot in which my [her] mother's remains are interred;" and a gift of the residue of the estate "to such charitable uses and purposes as he [the executor] may determine." In this document William A. Kinnerk of St. Louis, Missouri, was named as executor. Both paper writings were presented to the Probate Court of the City of St. Louis; the one executed on August 12th was admitted to probate; the other was rejected.

As stated, plaintiff was the sole beneficiary under the first will. The defendants are the heirs at law of the deceased, the executor named in the second will, and the trustees in charge of the cemetery at Cowden, Illinois.

The petition filed in the circuit court set forth both documents at length. It alleged that the one dated August 11th was duly executed as and for, and was, the last will of the deceased; but that the one dated August 12th was not her last will—that "the defendant, William A. Kinnerk, and the witness, Flora Flannery, by fraud, undue influence and coercion obtained said deceased's signature to the paper writing dated August 12, 1923, purporting to be the last will of Arrena R. Pierron, deceased." It then prayed that an issue of will or no will be framed with respect to each and a trial thereof had.

The executor and the cemetery trustees answered denying the allegations of fraud and undue influence and averring that the paper writing of August 12th, admitted to probate by the probate court as and for the last will of deceased, was in fact her last will. The heirs, in addition to their answers, filed cross-petitions in which they alleged that the deceased at the time she signed the documents was without testamentary capacity and that her signature to each of them was obtained by fraud and undue influence.

The will of August 12th was not set out in the bill of exceptions. However, it appears to have been read in evidence; and formal admission was made in all the answers that the purported copy appearing in the petition was a correct copy.

When the evidence was all in, on the trial below, the court peremptorily instructed the jury to find that the paper writing of August 11, 1923, was not the last will of the deceased, but that the writing of August 12th was such will. The jury returned a verdict as directed

and judgment in conformity therewith was duly entered. The plaintiff and the heirs applied for and were allowed separate appeals to this court. The appeal of the plaintiff was docketed as No. 26,327, and that of the heirs as No. 26,761. When the first was called for argument the second was by agreement of the parties advanced and consolidated with it. The heirs have seemingly abandoned their appeal. They have filed neither abstract nor brief on that appeal. They have briefed the case as respondents in plaintiff's appeal, and in so doing have contented themselves with merely controverting the positions taken by plaintiff-appellant.

The foregoing sufficiently indicates the issues tried in the circuit court, the parties thereto, and the record situation here. The feature of the case to which we next address ourselves is the evidence. A brief review will suffice.

At the time of the signing of the documents in controversy, Mrs. Pierron was a widow; her husband had been dead several years; she had no children or other descendants; she had become estranged from her kindred; she lived alone. While a bit eccentric, she was, nevertheless, able to manage her property and affairs with skill and shrewdness, and in doing so she was active and bustling up to the time of her last illness. Her property consisted of cash and securities to the amount of about $7000, and a residence on Delmar Avenue, which was appraised after her death at $5000, but for which her executor was subsequently offered $17,000.

About two years before the making of the wills Mrs. Pierron moved out of her residence on Delmar and leased it for $70 per month. She thereupon rented two rooms, the upper story of a building which had been used as a garage, in the rear of 3203 North Newstead, for which she paid five dollars a month. She stored the most of her furniture in one of the rooms, the other she fitted up for living quarters. It appears that when she vacated her home on Delmar she rented the rooms in the garage building merely for storage purposes, intending to make her home with some of her relatives, but that subsequently she abandoned that intention.

Janette Wentura, plaintiff's wife, came from Cowden, Illinois, to St. Louis, when a young girl, to make her home with an aunt. Mrs. Pierron's relatives lived at Cowden and she had spent her early life there. Upon meeting Janette, she at once manifested a friendly interest in her and soon there existed quite an attachment between the two. Subsequently Janette married, but the friendship between the two women continued, and in later years, after Mr. Pierron's death, the relations between Mrs. Pierron and Mr. and Mrs. Wentura and their family were extremely close and friendly, the former often expressing an intention of leaving the latter her property upon her death.

In the early part of August, 1923, Mrs. Pierron, while living alone in the "garage," was taken ill with an acute attack of dysentery. After having suffered for several days from the illness, she yielded to the solicitations of the Wenturas and permitted them to take her to their home. What then happened we gather from the testimony of the plaintiff and his wife: They lived in a small apartment or flat. They had three children, a boy twelve years of age, a girl two or three years younger, and a baby of eleven months. The boy was sick, suffering from the same malady as Mrs. Pierron. He occupied the one bed-room of the apartment; Mrs. Pierron was put in a Murphy in a door-bed in the sun room. Mrs. Wentura had no one to assist her in keeping house and caring for the sick, and presently began to exhibit symptoms of crossness and fatigue. Mrs. Pierron observing this suggested that she be taken to a hospital. Thereupon Wentura called a number of hospitals by phone, but each of them upon learning the nature of Mrs. Pierron's illness, refused to receive her as a patient. She then suggested that she be taken to the City Hospital, and this was done on the night of August 8th. Wentura accompanied her in the ambulance; she was put in a ward where there were a number of other patients. He visited her the next day shortly after noon and on that visit she directed him to go to the Mercantile Trust Company and tell Mr. King Kauffman, an officer of that institution who had long been her business adviser, that she desired to see him. The second day thereafter, Saturday, August 11th, Wentura made his next visit to the hospital. He then reported that Mr. Kauffman was out of the city and would not return for several days. She told him to get a lawyer and to call Mrs. Flora Flannery and tell her that she (Mrs. Pierron) was ill at the City Hospital. It being Saturday afternoon Wentura had some difficulty in finding a lawyer, but finally ran across Mr. H. L. Weismantel, with whom he had no previous acquaintance, and took him to the hospital. Mrs. Pierron told Weismantel that she wanted to make a will. Thereupon, following her directions, he prepared the will of August 11th, which she signed in the presence of two hospital physicians as attesting witnesses. While all of this was being done plaintiff absented himself from the room. The will was read to him by Mr. Weismantel after they left the hospital. As soon as plaintiff reached his home, about six P. M., he called Mrs. Flannery and conveyed to her Mrs. Pierron's message. This history of subsequent happenings must be gathered largely from the testimony of Mr. Kinnerk and Mrs. Flannery.

Mrs. Flannery was an old friend of Mrs. Pierron, but their contacts in recent years had been infrequent. It seems that when the latter took up her abode in the garage she endeavored to conceal that fact from her former associates. But when she found herself

in the City Hospital she sent for Mrs. Flannery. The latter came the next day after receiving the message, Sunday, August 12th. Upon her arrival she expressed indignation that her friend should have been brought to a hospital intended only for the indigent who had neither relatives nor friends. Mrs. Pierron said that she had been "railroaded" there, that she had wanted to go to the Deaconess Hospital. Presently Wentura came; there was an exchange of friendly greetings between him and Mrs. Pierron, and she introduced him to Mrs. Flannery. She then asked why he had brought her to the City Hospital; he said that he had tried to have her admitted to some other, but was unable to do so. After a brief visit he left, saying that he and his wife would come in the evening. Soon after he had gone Mrs. Pierron expressed a desire to make another will as the one she had just made contained no provision for the cremation of her body and the erection of a monument in Bellefontaine, where the ashes of her husband were buried. Mrs. Flannery suggested that she wait until Wentura returned and then ask him to recall the lawyer who had drawn the will the day before; she explained that the matters omitted from the will could be added in a codicil. But Mrs. Pierron being insistent that another lawyer be called, Mrs. Flannery phoned Mr. Kinnerk, who acted as her legal adviser whenever she happened to need one. Kinnerk responded immediately. He was met by Mrs. Flannery as he got off the street car; she told him what was wanted as they walked to the hospital. We will let him tell what occurred when he was ushered into Mrs. Pierron's presence:

"I went into the hospital and was introduced to Mrs. Pierron. She was lying in bed there, in a ward, and went down to business pretty quick. She went ahead to tell me what she wanted to do with the property. I let her do all the talking, and she told me, without any questioning on my part, exactly what disposition she wanted made of her property, until we came, I think, to the provision just before the charity business. She quit then, and I was waiting for her to say something else. She said nothing. I asked her if she would not—did not want to leave something to her relatives. . . . She said, 'No, absolutely.' . . . I did not know what Mrs. Pierron had or did not have. I did not know then whether she was worth a dollar or ten thousand dollars, or a hundred dollars, but I said to her, 'Now, after these things are paid for—the monument and the bequest to the cemetery at Cowden, there may be something left, there maybe a dollar or two left,' and I said, 'We have got to make disposition of that; if we don't, it will go to the relatives. It will have to go there, whether you like it or not.' . . . She said, 'No, absolutely nothing to my relatives.' Very emphatic about it. . . . After I told her about the relatives she asked Mrs. Flannery, she says, 'I want to leave it to you, Mrs. Flannery.' Mrs. Flannery said, 'No, I don't want it, and I won't have it.' I said, 'Well, we got to do

something about this; if you do not want your relatives to have anything, something has got to be done with it.' So I waited and waited, and she said nothing, so I suggested the charity proposition. I said, 'You could not do anything better with the money than to leave it to some charity or charities.' 'Well,' she said, 'that was a good idea.' 'Well,' I said, 'now have you any charity in mind?' . . . She said, 'No, do as you please,' meaning me. Then I asked her about the executorship. 'Somebody,' I said, 'will have to execute the will.' Then she turned to Mrs. Flannery again and asked her if she would not act. Mrs. Flannery said 'No.' Then she turned around to me and said, 'Mr. Kinnerk, will you act?' I said, 'Yes, that will be all right.' . . . Then I stepped out into the hall, right adjoining her ward, and somebody out there gave me the paper on which the will was written. So I started to write up a will. I was writing it. Mrs. Flannery came out and made a suggestion, 'Don't you think it would be better to leave the Wenturas or her relatives something?' I said, 'No, what Mrs. Pierron says must stand.' So the will was written out as she directed it.''

In his cross-examination, the witness said that while he was getting from Mrs. Pierron the data for the will, Mrs. Flannery was sitting on the side of the bed talking to her from time to time in a low voice. Mrs. Flannery testified that she tried to persuade Mrs. Pierron to leave something to the Wenturas and to her aged brother, Harrison Hart, and failing in that, she sought to have Mr. Kinnerk insert such provisions in the will without Mrs. Pierron's knowledge.

On Sunday night or Monday morning Mrs. Flannery at Mrs. Pierron's request called Dr. Hanke. He was Mrs. Pierron's regular physician, but up to that time had not been called to attend her in the illness from which she was then suffering. On Monday he had Mrs. Pierron moved to the Mullanphy Hospital, assigned to a private room and put in charge of a special nurse. On Tuesday he caused to be put on the door of her room the following notice: ''No one allowed without an order from the attending physician.'' She died early Thursday morning.

Mrs. Flannery seems to have remained in constant attendance upon Mrs. Pierron from Monday until the latter's death. Mrs. Wentura was allowed a brief visit on Tuesday afternoon at Mrs. Flannery's solicitation, notwithstanding the no admittance order. On Tuesday evening Mr. Wentura made frantic efforts to see Mrs. Pierron, but the nurse would not admit him without an order from Dr. Hanke and that the Doctor declined to give.

The evidence was somewhat voluminous, but the foregoing is a summary of all that has any bearing on the questions involved.

Appellant assigns as error the action of the trial court in directing the jury to find that the paper writing of August 11, 1923, was not

the last will of Arrena R. Pierron, and to further find that the writing of August 12th was her last will.

If the paper writing of August 12th was the last will of the deceased, we need have no further concern about the will of August 11th, because the former in express terms revoked all wills theretofore made by the testatrix. [Sec. 508, R. S. 1919.] For that reason questions touching the validity of the later of the two alleged wills require consideration first.

The document of August 12th is challenged on the sole ground that it was obtained through "fraud" and undue influence, practiced by defendant Kinnerk and the witness Flannery. The petition charges that these two, for the purpose of enriching themselves, persuaded the testatrix by false and fraudulent representations to revoke the old will and make a new one. As to what the representations claimed so to have been made were, the petition is silent; and the evidence is equally unenlightening with respect to them. So far as Mrs. Flannery is concerned, there is not a scintilla of evidence tending to show that she, by means of false representations or otherwise, attempted to or did enrich herself through the making of the second will. As to Kinnerk, appellant's contention is this: The clause in the will giving the residue of the estate "to such charitable uses and purposes as he (the executor) may determine" being void for uncertainty, the legal effect of it was to vest the residuary estate in the executor-trustee; this Kinnerk, a lawyer, knew when he prepared the will; his action in having thus drawn a will in his own favor, under the circumstances disclosed by the evidence, was presumptively fraudulent; it was incumbent upon him therefore to convince the *jury* to the contrary. This contention rests wholly upon the construction which appellant puts upon the will; and one that is manifestly erroneous. There can be no doubt but that the bequest to charity is void, but it does not follow that the executor (trustee) takes beneficially. According to the plain language of the will the residuary estate is given to "charitable uses and purposes," and not to Kinnerk. He is given merely a power of appointment A trust was clearly intended. The applicable principles of construction find expression in the early case of Schmucker's Estate v. Reel, 61 Mo. 592, 597. In that case it was said:

"Bequests for purposes of benevolence and general liberality, such as the trustee shall approve or direct, cannot be supported either as general trusts or for charitable uses. In Morice v. Bishop of Durham (9 Ves. 399), Sir WILLIAM GRANT, M. R., in discussing the different trusts and the principles of law applicable to them, lays down the following propositions: First, if property is given to one with a mere recommendation that he apply a portion of the income in a particular mode, intending to leave it optional with the donee, the

gift is absolute; second, if the donee is a mere trustee to carry into effect the purposes of the testator in regard to certain persons intended to be benefited but not sufficiently identified in the will, the property is undisposed of, and courts of equity will not attempt to carry those purposes into effect by conjecture merely, but will regard the property as belonging to the heir, or the next of kin, as the case may be." [See also Jones v. Patterson, 271 Mo. 1, 9, 195 S. W. 1004 and cases cited.]

Mr. Kinnerk therefore is not a beneficiary under the will; nothing will accrue to him therefrom except the fees fixed by law for his services as executor. And there is no pretense that, prior to his employment to draw her will, he ever sustained to the testatrix a fiduciary relation. It follows that the burden of proving the absence of undue influence at no time devolved upon the proponents of the will. [Ryan v. Rutledge, 187 S. W. 877.]

Evidence of the exercise of undue influence, either direct or circumstantial, is wholly lacking. The facts: that Mrs. Pierron within twenty-four hours changed her mind with respect to the disposition she wished to make of her property, that Mr. Kinnerk and Mrs. Flannery assisted her in carrying out her changed purpose, that Mrs. Flannery was in constant attendance upon her during the last four days of her illness, and that on the last day thereof visitors, including plaintiff, were excluded from the sick room by order of the attending physician, do not, taken either singly or altogether, tend to controvert or cast suspicion upon the positive testimony of Kinnerk and Mrs. Flannery that the will was the voluntary and uninfluenced act of the testratrix. Neither of them had any motive, either of self-interest or dislike, for intervening to deprive plaintiff of a share in the testratrix's estate.

The judgment of the circuit court is in all things affirmed. All concur.